IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCEL PERRY, AF4227,<br><br>    Petitioner,<br><br>  v.<br><br>CLARK DUCART, Warden,<br><br>    Respondent. | No. C 15-0654 CRB (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

    Petitioner Marcel Perry, a California state prisoner proceeding pro se, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Alameda County Superior Court. For the reasons set forth below, the petition will be denied.

### STATEMENT OF THE CASE

    On August 24, 2010, Petitioner was convicted by a jury of first degree murder, shooting at an occupied vehicle, and felony gun possession with various gun and gang-related enhancements. People v. Perry, No. A130484, 2013 WL 4476082, at **1-2 (Cal. Ct. App. Aug. 15, 2013). On November 19, 2010, the trial court sentenced Petitioner to fifty-five years and eight months to life in state prison. Id. at *2.

    On August 15, 2013, the California Court of Appeal affirmed the judgment of the trial court and, on November 13, 2013, the California Supreme Court denied review.

    On February 11, 2015, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court. Per order filed on July 23, 2015, the Court found that the petition, when liberally construed, stated cognizable claims under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. On August 31, 2015, Respondent filed an answer. Petitioner did not file a traverse.

**STATEMENT OF THE FACTS**

The California Court of Appeal summarized the facts of the case as follows:

On November 20, 2008, at about 5:00 p.m., Vincent Scott, a.k.a. "Pooh," was shot to death while driving his vehicle near the intersection of San Pablo Avenue and Myrtle Street in West Oakland. Witnesses, including Shalom Bower, Deborah Sherman and Daniel Ramos, heard about 20 gunshots. Bower and Sherman saw a silver van with a vanity license plate driving away from the scene with its tires squealing. Ramos saw an African–American man in his early 20s holding a large rifle pointed in the direction of San Pablo and then running down Myrtle. Ramos then saw another car crash into a roll-up door. The driver of this vehicle was later identified as Scott, a member of the Ghost Town gang with a reputation in Oakland for violence who was killed by gunshots to the back of his head.

A police investigation ensued, yielding the following evidence. A cell phone was found at the crime scene containing numerous photos of [Petitioner] (including photos he took of himself) and DNA on the earpiece and mouthpiece that matched his DNA. In addition, 27 gun casings were found that criminalists later determined were mostly fired from the same weapon. Finally, police recovered the silver van with vanity plates identified by eyewitnesses Bower and Sherman, which was traced to owner Oscar Harper. While Harper was confirmed to be out of town on the day in question, his nephew, Jamie Wallace (a.k.a. "J-Dub"), was seen driving the van at about 2 p.m.

On January 6, 2009, Oakland Police Officer Steve Valle went to the Acorn Housing Complex to investigate a report from a confidential informant that [Petitioner] and a man named Houston Nathaniel were in the area in possession of firearms. Officer Valle observed [Petitioner] in video footage from a surveillance camera handing a suspected firearm to Nathaniel, who then placed the item in his waistband. Officer Valle thus had the two men arrested, at which time two firearms were found on Nathaniel.

On April 7, 2009, [Petitioner] was interviewed in connection with Scott's murder for about five hours by Oakland Police Inspector Gus Galindo. During this interview [Petitioner] confessed to shooting Scott. The next day, [Petitioner] was interviewed by Deputy District Attorney Colleen McMahon, for whom he drew a diagram showing his location during the shooting.

Trial began July 21, 2010. Among other witnesses, Officer Valle testified for the prosecution as an expert on Oakland gang activities. Officer Valle identified [Petitioner] as a member of the Acorn gang, an "informal" gang with about 50 to 75 members. In addition to sharing common symbols and signs, the Acorn gang engaged in a wide variety of criminal activity, including murder, shootings, narcotics and firearm possession, and robbery. Officer Valle further explained that Acorn had been a rival gang to Ghost Town, Scott's gang, since June 2006. The territories of these two gangs were just blocks apart in Oakland.

In identifying [Petitioner] as an Acorn member, Officer Valle pointed to [Petitioner's] tattoo, his gang moniker ("Woodah"), the names of fellow gang members found on his cell phone call list, and photographs found on

his cell phone and at his home that included photographs of individuals flashing Acorn's gang sign. Officer Valle believed the murder in this case was gang-related based upon Scott's presence in Acorn territory, which would have been perceived as a showing of disrespect to Acorn by Ghost Town; the use of a high-powered assault weapon, a commonly used Acorn weapon; and the crime's highly visible location in a major West Oakland thoroughfare, which would have enhanced Acorn's violent reputation.

[Petitioner], testifying on his own behalf, claimed Acorn was a housing project rather than a gang. [Petitioner] also claimed that, in the Acorn area at about noon on the day of the shooting, he saw an acquaintance, Warren Ingram, walking around with an assault rifle, and saw Scott circling the block a few times. [Petitioner] insisted that, in the evening, when he learned of the shooting, he was at his sister's house. Ingram later told [Petitioner] that he shot Scott. According to [Petitioner], he nonetheless falsely confessed shooting Scott to Inspector Galindo because he feared what would happen to his family if he snitched on Ingram (who is now dead, so no longer a threat). [Petitioner] acknowledged also telling Inspector Galindo that Jamie Wallace, who was still alive, was the van's driver, and could not explain why this disclosure was not "snitching." Nor could defendant explain why his cell phone was found at the crime scene.

Corroborating [Petitioner's] alibi was 17-year-old T.B., who testified that he saw two people in a Buick car shoot Scott on the day in question. T.B. did not know the shooters' identities, but confirmed defendant was not one of them. T.B. acknowledged on cross-examination that he was arrested for robbery on December 4, 2008 and that, on the same day, he gave a statement to Inspector Galindo about witnessing Scott's murder.

Perry, 2013 WL 4476082, at **1-2.

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in Supreme Court holdings (as opposed to the dicta) as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## CLAIMS & ANALYSIS

Petitioner raises two claims for relief under § 2254: (A) prosecutorial misconduct and (B) discriminatory use of peremptory challenges to strike two African-American jurors. The Court will address each of the claims in the foregoing order.

A.     Prosecutorial Misconduct

Petitioner claims prosecutorial misconduct because during his cross examination, the prosecutor improperly insinuated that the defense's expert, if called as a witness, would have testified that petitioner was a gang member. See Pet. at 9-10. The claim is without merit.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986); see also

4

1  Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases
2  of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the
3  prosecutor"). Under Darden, the first issue is whether the prosecutor's conduct was
4  improper; if so, the next question is whether such conduct infected the trial with unfairness.
5  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). But even then, federal habeas relief is
6  in order only if the denial of due process based on prosecutorial misconduct had a substantial
7  and injurious effect or influence in determining the jury's verdict. See Brecht v.
8  Abrahamson, 507 U.S. 619, 637 (1993). Petitioners must establish that the misconduct
9  resulted in "actual prejudice." Id.

During petitioner's cross examination, the prosecutor questioned Petitioner about retaining a defense expert. The relevant portion of Petitioner's cross examination follows:

PROSECUTOR: He was hired to provide an opinion that you are not part of a gang. You understand that, right?

[PETITIONER]: Right.

PROSECUTOR: He was hired, after he talked to you, to come in and testify to that. Do you understand that?

[PETITIONER]: Yep.

PROSECUTOR: You know he is not coming in here to testify, right?

[PETITIONER]: Right.

PROSECUTOR: You know what perjury is?

[PETITIONER]: No.

PROSECUTOR: Lying under oath?

[PETITIONER]: (No response.)

PROSECUTOR: Do you understand that Dr. – I think he is a doctor – Dr. Minagawa would not come in here and perjure himself? Do you understand that?

[PETITIONER]: Yes.

PROSECUTOR: He wasn't going to come in here, your expert hired by your attorney to come in here and say you are not in a gang. Do you understand that?

[PETITIONER]: Yep.

5

Perry, 2013 WL 4476082, at *5.

Petitioner claims that the prosecutor's mentioning of Dr. Minagawa during cross examination was unfair because Dr. Minagawa never testified. According to Petitioner, the prosecutor's questions amounted to "arguing matters not in evidence." Pet. at m5. Petitioner further claims that without any form of limiting instruction given after this incident, its effects were wholly unmitigated and resulted in a fundamentally unfair trial. See id. at m8–9.

The California Court of Appeal rejected Petitioner's prosecutorial misconduct claim as follows:

> Putting aside [Petitioner's] apparent waiver of this issue by failing to provide a timely objection setting forth relevant grounds for his request (People v. Green (1980) 27 Cal.3d 1, 27), we affirm the trial court's decision to reject the limiting instruction for the following reason. Given the overwhelming evidence in the record of [Petitioner's] guilt and the relative insignificance of the Dr. Minagawa-related evidence, even if the trial court erred by refusing to give the proposed limiting instruction, any such error must be deemed harmless. In particular, as the People note, [Petitioner] was subjected to a lengthy cross-examination, with the challenged portion constituting a relatively small percentage of his total time on the stand. Second, there was a wealth of other evidence in the record proving Acorn was a criminal gang to which [Petitioner] belonged, including photographs of [Petitioner] and other gang members flashing Acorn's gang sign found on his cell phone recovered from the murder scene and at his home. Third, and more importantly, the jury was instructed prior to deliberations that attorneys' statements and questions are "not evidence," and that the jury must not "assume to be true any insinuation suggested by a question asked a witness." We presume the jury followed these clear instructions and, accordingly, conclude any misconduct was not prejudicial. (People v. Mooc (2001) 26 Cal.4th 1216, 1234.)
>
> Finally, with respect to [Petitioner's] related claim that the prosecutor's questions rendered his trial fundamentally unfair by introducing before the jury facts not in evidence, we note that prosecutorial misconduct must rise to the level of reprehensibility or deception to warrant reversal on appeal. (People v. Hill (1998) 17 Cal.4th 800, 822-823.) Here, while we agree with [Petitioner] the prosecutor's questions were inappropriate given their dubious relevance to the purported issue of defendant's state of mind, we nonetheless conclude there is no such reprehensibility or deception reflected in the record. Defense counsel advised the court before trial that Dr. Minagawa would testify about [Petitioner's] relationship with the Acorn gang (which defendant denied was a gang), based on his prison interview with [Petitioner]. However, defense counsel later decided not to call Dr. Minagawa as a witness. These circumstances gave the prosecutor a good faith basis to draw the conclusion that Dr. Minagawa was not able to provide under oath an opinion favorable to [Petitioner's] case. Accordingly, the trial court's denial of [Petitioner's] request for a limiting instruction must stand. (See People v. Mooc, supra, 26 Cal.4th at pp. 1233-1234 [no prejudicial prosecutorial misconduct where the prosecutor had a good faith belief that a factual basis existed for his insinuations to an

6

> adverse witness on the stand, even though there was no actual basis in the record]. Cf. People v. Daggett (1990) 225 Cal.App.3d 751, 757-758 [prosecutor engaged in prejudicial misconduct by suggesting a child sexual abuse victim must have learned about certain sexual activities from defendant after the prosecutor successfully moved to exclude contrary evidence that the victim had been molested by another]; People v. Varona (1983) 143 Cal.App.3d 566, 570 [prosecutor engaged in prejudicial misconduct where "the prosecutor not only argued the 'lack' of evidence where the defense was ready and willing to produce it, but he compounded that tactic by actually arguing that the woman was not a prostitute although he had seen the official records and knew that he was arguing a falsehood"].)

Perry, 2013 WL 4476082, at *6 (footnotes omitted).

The California Court of Appeal's rejection of Petitioner's prosecutorial misconduct claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The state appellate court reasonably concluded that although the prosecutor's questions were inappropriate, they did not violate Petitioner's due process rights by rendering his trial fundamentally unfair, see Darden, 477 U.S. at 181, or prejudice him, see Brecht, 507 U.S. at 637. The court reasonably found that the improper questions regarding Dr. Minagawa were relatively insignificant because they comprised only a brief and isolated portion of the prosecutor's lengthy cross examination of Petitioner. See Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987) (considering whether misconduct was isolated or part of an ongoing pattern in determining whether misconduct violated due process). And it also reasonably found that the improper questions had a relatively insignificant effect on the jury's finding that Petitioner was in a gang because there was a significant amount of other evidence in the record showing that Petitioner was in a gang. See United States v. Young, 470 U.S. 1, 19 (1985) (considering weight of evidence of guilt in determining whether misconduct violated due process). Under the circumstances, it simply cannot be said that the state court's rejection of Petitioner's claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). Petitioner is not entitled to federal habeas relief on his prosecutorial misconduct claim.

7

1    B.    Discriminatory Use of Peremptory Challenges

2           Petitioner claims his right to equal protection was violated when the prosecutor was
3    allowed to use peremptory challenges to strike two prospective African-American jurors,
4    Gloria Johnson and Rhonda White-Warner, based on their race. See Pet. at 9. The claim is
5    without merit.

6           It is well established that the Equal Protection Clause forbids the challenging of
7    potential jurors solely on the basis of race. Batson v. Kentucky, 476 U.S. 79, 89 (1986).
8    Batson challenges involve a three-step inquiry. Rice v. Collins, 546 U.S. 333, 338 (2006).
9    First, the defendant must make a prima facie showing that the prosecutor has exercised a
10   peremptory challenge based on race. Id. If this showing is made, the burden then shifts to
11   the prosecutor to offer a race-neutral explanation for the strike. Id. Finally, the court
12   evaluates "the persuasiveness of the justification proffered by the prosecutor" to decide
13   whether the defendant has shown purposeful discrimination. Id. (internal quotation marks
14   omitted). Ultimately, the defendant has the burden of persuading the court that the strike was
15   racially motivated. Id. (citing Purkett v. Elem, 514 U.S. 765, 768 (1995)).

16          The California Court of Appeal rejected Petitioner's Batson equal protection claim as
17   follows:

> The relevant law is not in dispute. "[U]se of peremptory challenges to strike prospective jurors on the basis of group bias – that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'– violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution" and "the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (People v. Avila (2006) 38 Cal.4th 491, 541, citing Batson v. Kentucky (1986) 476 U.S. 79, 88 [Batson]; People v. Wheeler (1978) 22 Cal.3d 258, 276-277 ["remov [ing] prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution"] [Wheeler].)
>
> When, as here, a defendant challenges the prosecution's use of peremptory strikes by way of a so-called Wheeler/Batson motion, he or she must comply with the following procedures. First, the defendant must "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.]" (People v. Williams (2013) 56 Cal.4th 630, 649.) Second, if the defendant succeeds in making this prima facie case, "the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible

race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" [Citation.] (Johnson v. California (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.) (People v. Williams, supra, 56 Cal.4th at p. 649; see also People v. Johnson (1989) 47 Cal.3d 1194, 1216.)  "The existence or nonexistence of purposeful racial discrimination is a question of fact." (People v. Lewis (2008) 43 Cal.4th 415, 469.) As such, on appeal, we must uphold the trial court's denial of a Wheeler/Batson motion "if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe . . . the juror." (People v. Holt (1997) 15 Cal.4th 619, 651; see also People v. Williams, supra, 56 Cal.4th at p. 649.) " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' [Citation.] As long as the court 'makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' [Citation.]" (People v. Williams, supra, 56 Cal.4th at p. 650.)

Here, the trial court denied [Petitioner's] Wheeler/Batson motion at the first stage, finding that he failed to make a prima facie showing that the totality of the relevant facts gave rise to an inference of discriminatory purpose. Nonetheless, even in the absence of burden shifting, the prosecutor chose to go forward with an offer of permissible race-neutral justifications for the challenged strikes, which the trial court accepted as proof of the lack of purposeful racial discrimination. (See People v. Williams, supra, 56 Cal.4th at p. 649.) Putting aside this particular nuance of the Wheeler/Batson process in this case, we find no grounds for disturbing the trial court's decision to deny [Petitioner's] motion given the substantial evidence supporting the prosecutor's race-neutral justifications for striking prospective jurors Ms. Johnson and Ms. White-Warner.

Specifically, with respect to Ms. Johnson, the prosecutor explained that he excused her from the jury pool based upon the following facts: her cousin was incarcerated on drug charges in North Carolina and she had visited him there; she expressed on a jury questionnaire her beliefs that African-Americans are subject to different treatment and that "without money there is no justice;" and she stated during voir dire her belief that prisons are not good places and that, should defendant end up incarcerated, two lives would be lost rather than one (the victim's and defendant's), a fact that will likely remain on her mind should she be on the jury. Given these circumstances, the prosecutor explained, he was concerned about Ms. Johnson's expressions of sympathy and her dislike of prisons. The record of Ms. Johnson's voir dire is in all significant regards consistent with the prosecutor's explanation. As such, because the prosecutor's stated reasons for excusing Ms. Johnson are reasonably grounded, not in purposeful discrimination, but rather in the common trial strategy of avoiding jurors who might improperly decide a defendant's guilt based on sympathy or aversion to imprisonment, there are no grounds for reversal in her case. (People v. Lewis, supra, 43 Cal.4th at p. 469 ["The credibility of a prosecutor's stated reasons for exercising a peremptory challenge 'can be measured by, among other factors . . . how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy' "].)

> Moreover, we reach a similar conclusion with respect to the challenge to Ms. White-Warner, a program manager for the HIV/AIDS Ministry Project at the Allen Temple who had conducted creative writing workshops for female inmates at Santa Rita. The prosecutor explained his decision to excuse Ms. White-Warner as follows. First, he noted that Ms. White-Warner described herself as "an activist of sorts," who saw the need for "radical healing" and "increased dialogue" between the police and the African-American community in Oakland. Second, he pointed to "[w]hat she does for a living, she is a minister" with a degree in restorative justice. According to the prosecutor, based on these facts, "I don't think there could be potentially a juror who would be more sympathetic towards a defendant." Again, the record supports the adequacy of the prosecutor's explanation. No more is required. (People v. Reynoso (2003) 31 Cal.4th 903, 924 ["All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory. '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection' "]; People v. Guerra (2006) 37 Cal.4th 1067, 1101 [same].) Accordingly, because [Petitioner] has again failed to provide any ground for reversing the trial court's denial of his Wheeler/Batson motion, [his claim is denied].

Perry, 2013 WL 4476082, at **3-4 (footnotes omitted).

A state court's determination that a criminal defendant failed to establish a prima facie case of discriminatory use of a peremptory challenge under Batson generally is entitled to a presumption of correctness on federal habeas review. See Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) (en banc). But because the state trial and appellate courts proceeded to consider the prosecutor's proffered race-neutral explanations for striking the two jurors and determined that the peremptory challenges were not racially motivated, the court will proceed directly to the ultimate Batson question of whether petitioner has shown purposeful discrimination. Cf. Hernandez v. New York, 500 U.S. 352, 359 (1991) (suggesting that once prosecutor has offered race-neutral explanation for peremptory challenge and state court has ruled on ultimate question of intentional discrimination, preliminary issue of whether defendant has made prima facie showing becomes moot).

Petitioner claims that the state courts unreasonably determined that the prosecutor did not engage in purposeful discrimination in striking Ms. Johnson and Ms. White-Warner. He argues that both of these prospective jurors answered questions by the prosecutor which showed that they could be fair and neutral in their decision making. See Pet. at 2–3, m3–m4. Petitioner's claim does not warrant federal habeas relief.

10

In deciding if the defendant has carried his burden of persuasion at Batson's third step, "a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Batson, 476 U.S. at 93 (internal quotation marks omitted). The "totality of the relevant facts" includes the "prosecutor's statements about his jury selection strategies and his explanations . . . for striking minority jurors" as well as "the characteristics of people he did not challenge." Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006) (en banc).

When evaluating the persuasiveness of the prosecutor's justifications at Batson's third step, the trial judge is making a credibility determination. Although the prosecutor's reasons for the strike must relate to the case to be tried, the court need not believe that "the stated reason represents a sound strategic judgment" to find the prosecutor's rationale persuasive; rather, it need be convinced only that the justification "should be believed." Id. at 359 (quoting Hernandez, 500 U.S. at 365). Because "it is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered justifications," due deference must be accorded to the trial judge's determination. Briggs v. Grounds, 682 F.3d 1164, 1171 (9th Cir. 2012). Indeed, even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." Rice, 546 U.S. at 341-42.

A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2). See Briggs, 682 F.3d at 1170. "Thus, a state court's decision will be upheld unless it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Jamerson v. Runnels, 713 F.3d 1218, 1225 (9th Cir. 2013) (quoting 28 U.S.C. § 2254(d)(2)). Indeed, in evaluating habeas petitions premised on a Batson violation, "our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial

11

evidence, we must uphold it." Briggs, 682 F.3d at 1170 (citing Rice, 546 U.S. at 338-42). "This is because the question of discriminatory intent 'largely will turn on evaluation of credibility' and 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.'" Jamerson, 713 F.3d at 1225 (quoting Hernandez, 500 U.S. at 365).

The California Court of Appeal's determination that substantial evidence supported the trial court's finding that the prosecutor did not excuse Ms. Johnson or Ms. White-Warner based on their race was not objectively unreasonable. See Rice, 546 U.S. at 341-42. The state appellate court reasonably determined that the reasons offered by the prosecutor for excusing Ms. Johnson – her cousin was incarcerated on drug charges in North Carolina and she had visited him there; she expressed on a jury questionnaire her beliefs that African-Americans are subject to different treatment and that without money there is no justice; and she stated during voir dire her belief that prisons are not good places and that, should defendant end up incarcerated, two lives would be lost rather than one (the victim's and defendant's), a fact that will likely remain on her mind should she be on the jury – were race-neutral reasons and that the trial court's finding that the reasons were genuine should be accorded deference. See United States v. Hendrix, 509 F.3d 362, 370 (7th Cir. 2007) (prosecutor's concern that jurors with relatives in prison may sympathize with a defendant, or have feelings of animosity against the prosecution, race neutral); United States v. Bauer, 84 F.3d 1549, 1554-65 (9th Cir. 1996) (prosecutor's concern that juror might harbor anti-witness or anti-government bias race neutral). And it reasonably determined that the reasons offered by the prosecutor for excusing Ms. White-Warner – she was a minister and program manager who worked with female inmates and described herself as an activist of sorts, who saw the need for radical healing and increased dialogue between the police and the African-American community in Oakland – were race-neutral reasons and that the trial court's finding that the reasons were genuine should be accorded deference. See United States v. Maxwell, 473 F.3d 868, 872 (9th Cir. 2007) (inference that juror's employment might make

12

juror more sympathetic to criminal defendant valid, race-neutral reason for striking juror); United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987) (excluding jurors because of their profession wholly within prosecutor's prerogative).

The California Court of Appeal's determination that the prosecutor did not excuse Ms. Johnson or Ms. White-Warner based on their race also is supported by the fact that two African Americans remained on the jury – one as an alternate and one as juror number 12. But unlike Ms. Johnson and Ms. White-Warner, neither of the two African Americans on the jury expressed sentiments, or had life or professional experiences, that reasonably could have led the prosecutor to believe that they would have difficulty convicting Petitioner. And importantly, there is no evidence on the record that the prosecutor selected a non-black juror for the panel to whom the prosecutor's reasons for striking Ms. Johnson or Ms. White-Warner applied "just as well." Cf. Miller-El v. Dretke, 545 U.S. 231, 241 (2005) (where prosecutor's reasons for striking a black juror applies "just as well" to a non-black juror who is selected for the panel, "that is evidence tending to prove purposeful discrimination" that should be considered in assessing genuineness of prosecutor's proffered explanations).

Petitioner points out that both Ms. Johnson and Ms. White-Warner stated in one way or another that they could work with the court and other jurors to make sure justice was achieved. But this does not mean that the prosecutor's proffered concerns about Ms. Johnson's and Ms. White-Warner's other expressed sentiments, life and/or professional experiences were not genuine or race neutral. The California Court of Appeal considered Ms. Johnson's and Ms. White-Warner's statements that they could work with the court and other jurors to make sure justice was achieved, and determined that they "do not affect our ultimate conclusion that no discriminatory purpose in [their] excusal has been established on this record." Perry, 2013 WL 4476082, at *7 nn. 4 & 5. Petitioner's disagreement with the state court's reasonable determination does not make it otherwise.

Petitioner is not entitled to federal habeas relief on his claim that his right to equal protection was violated when the prosecutor was allowed to use peremptory challenges to

strike two prospective African-American jurors based on their race. It simply cannnot be said that the state courts' rejection of Petitioner's claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

## CONCLUSION

After a careful review of the record and pertinent case law, the court is satisfied that the petition for a writ of habeas corpus under § 2254 must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) also is DENIED because Petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in accordance with this order and close the file.

**IT IS SO ORDERED.**

Dated: March 14, 2016



CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE